FILED
MAY 20 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) INDICTMENT 3:20 CR 256 |
| Plaintiff, | ) JUDGE ZOUHARY |
| v. | ) CASE NO. MAG. JUDGE KNEPP |
| SHERRY-ANN JENKINS, OLIVER H. JENKINS, | ) Title 18, United States Code, Section 2; Title 18, United States Code, Section 1341; Title 18, United States Code, Section 1343; Title 18, United States Code, Section 1347; Title 18, United States Code, Section 1349. |
| Defendants. | |

GENERAL ALLEGATIONS

At all times relevant to this indictment:

1. The Toledo Clinic, Inc., an Ohio corporation formed in 1962, was a physician-owned, multidisciplinary medical practice in Toledo, Ohio. It employed approximately 160 physicians practicing in approximately 35 medical fields.

2. SHERRY-ANN JENKINS (S.A. JENKINS) was a resident of Ottawa Hills, Ohio. She was a doctor of philosophy (Ph.D.) in neuroscience. She was not licensed in any state to provide medical care to patients and had no clinical medical training or experience. SHERRY-ANN JENKINS was an employee of The Toledo Clinic.

3. OLIVER H. JENKINS (DR. O.H. JENKINS) was a resident of Ottawa Hills, Ohio and was married to SHERRY-ANN JENKINS. He was medical doctor licensed to practice in Ohio, specializing as an ear, nose, and throat physician (otolaryngology). He was an employee of The Toledo Clinic.

4. The term "health care benefit program," as defined in Title 18, United States Code, Section 24(b), means any public or private plan or contract, affecting commerce, under which any medical benefit, item or service was provided to any individual, and includes any individual or entity who provides a medical benefit, item or service for which payment may be made under the plan or contract. Medicare, Medicaid, the Railroad Retirement Board, the U.S. Office of Personnel Management, Paramount, United Health, Humana, Medical Mutual of Ohio, and Anthem (collectively the "Health Care Benefit Programs") were each a "health care benefit program" under Title 18, United States Code, Section 24(b).

5. Medical providers participating in the Health Care Benefit Programs agreed to bill only for services the provider actually rendered, that were medically necessary to diagnose and treat illness or injury, and for which the provider maintained adequate supporting documentation.

6. Each of the Health Care Benefit Programs required their providers to bill only for services each provider actually performed. To that end, each individual provider obtained a National Provider Identifier (NPI) number. Health care providers, such as individual physicians or clinical psychologists, used these unique 10-digit NPI numbers to identify themselves in a standard way throughout their industry. Providers used their assigned NPI number when submitting claims to identify themselves as the person providing the billed services.

7. Medical providers and health care benefit programs used well-known and standard insurance processing codes to identify certain medical diagnoses and medical treatments or procedures. The American Medical Association assigned and published five-digit codes, known as Current Procedural Terminology (CPT) codes. Medical providers recorded CPT and other codes on a standard claim form known in the industry as the CMS 1500 form, which was then sent to the Health Care Benefit Programs for reimbursement. CPT codes were

designated on the CMS 1500 claim form by the health care provider and then submitted either by mail or electronically to the Health Care Benefit Programs.

    8.    Several CPT codes covered psychological testing and examinations, including:

        a.    *CPT code 96118*. This code covered "Neuropsychological testing (*e.g.* Halstead-Reitan Neuropsychological battery, Wechlser Memory Scales and Wisconsin Card Sorting Test), per hour of the psychologist's or physician's time, both face-to-face time administering tests to the patient and time interpreting these test results and preparing the report."

        b.    *CPT code 96116*. This code covered "Neurobehavioral status exam (clinical assessment of thinking, reasoning and judgment, *e.g.*, acquired knowledge, reasoning and judgment, memory, planning and problem solving, and visual spatial abilities), per hour of the psychologist's or physician's time, both face-to-face time with the patient and time interpreting test results and preparing the report."

        c.    *CPT code 78608*. This code covered positron emission tomography. Commonly called a "PET scan," it was a diagnostic imaging procedure that assessed metabolic activity of an internal organ, such as the brain. A patient received an injection of a radioactive tracer substance and an image was then made of the tracer substance in the body. When medically necessary, physicians or other qualified health care providers referred patients for a PET scan to a radiologist who performed and billed the Health Care Benefit Programs for the procedure. The PET scans ordered by the defendants were reimbursed at approximately $715 per procedure.

9. By submitting claims using these CPT codes, medical providers represented to the respective Health Care Benefit Program that the services depicted in the codes were, in fact, performed, were provided in accordance with the CPT code description, were medically necessary, and were performed by the provider identified by the NPI number.

## COUNT 1
(Conspiracy, 18 U.S.C. § 1349)

The Grand Jury charges:

10. The factual allegations of paragraphs 1 through 9 of this indictment are incorporated herein.

11. From on or about November 1, 2013 and continuing until on or about March 1, 2016 in the Northern District of Ohio, Western Division and elsewhere, the Defendants, SHERRY-ANN JENKINS and OLIVER H. JENKINS, together with others known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, to commit offenses under Title 18, United States Code, Chapter 63, to wit:

   a. knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property of patients by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and attempting to do so, deposited and caused to be deposited in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service and any private and commercial interstate carrier, in violation of Title 18, United States Code, Section 1341;

    b. knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property of patients by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, and pictures, in violation of Title 18, United States Code, Section 1343;

    c. knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud the Health Care Benefit Programs, and to obtain by means of false and fraudulent pretenses, representations, and promises, money, and property owned by, and under the custody and control of the Health Care Benefit Programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## MANNER AND MEANS

12. The manner and means by which the conspiracy was conducted included the following:

13. The Toledo Clinic hired DR. O.H. JENKINS in 2009 as an otolaryngologist. DR. O.H. JENKINS partnered with another otolaryngologist at The Toledo Clinic, and the practice was financially successful.

14. In or around November 1, 2013, DR. O.H. JENKINS and S.A. JENKINS conceived a new business called the "The Toledo Clinic Cognitive Center" to diagnose and treat patients with cognitive disorders, particularly those suspected of suffering from dementia and

Alzheimer's Disease. The Cognitive Center would become a formal part of The Toledo Clinic, and it would be staffed by Toledo Clinic employees.

15. DR. O.H. JENKINS would serve as the Cognitive Center's Medical Director, while continuing his otolaryngology practice.

16. S.A. JENKINS would serve as the Cognitive Center's Director, responsible for seeing patients and the day-to-day operations of the Cognitive Center.

17. S.A. JENKINS had no clinical education, training, qualifications, or certifications. She was not a medical doctor, doctor of osteopathy, psychologist, physician's assistant, nurse practitioner, or any other medical service provider recognized by any governmental or regulatory body. She held no license in any jurisdiction to provide medical care because she was not qualified to obtain one. For similar reasons, she did not have an NPI number and was not authorized or qualified to obtain one.

18. From the Cognitive Center's opening in November 2014, S.A. JENKINS performed as a fully qualified and licensed physician or psychologist. She immediately began assessing, diagnosing, and treating patients for perceived cognitive disorders, including Alzheimer's Disease. She ordered a PET scan for nearly every patient she saw, frequently telling the reading radiologist to comment on specific parts of the scan, and then using the test results to "diagnose" a patient with a cognitive disorder. DR. O.H. JENKINS never saw these patients for cognitive care.

19. All of S.A. JENKINS's clinical activities, moreover, were billed using CPT codes 96116 and 96118, each of which was based expressly on the time a physician or psychologist spends with a patient by authorizing payment "per hour of the psychologist's or physician's time." S.A. JENKINS was neither a psychologist nor a physician, yet the Defendants billed her

6

services under these CPT codes using DR. O.H. JENKINS's NPI number, even though he never saw these patients.

20. The Defendants held the Cognitive Center out to the public as a legitimate medical clinic where patients could receive testing and treatment for cognitive disorders, but the Defendants never disclosed to the public or patients that S.A. JENKINS was neither trained nor licensed to provide any type of medical care. And they also failed to disclose that DR. O.H. JENKINS, who was licensed to provide medical care, was rarely present at the Cognitive Center during business hours and never saw or treated patients there. From all appearances, the Cognitive Center was a medical office providing the public with lawful, competent medical services.

21. Cognitive Center patients paid for the services as they would pay for them from any other qualified health care provider by using their own funds or insurance from the Health Care Benefit Programs. Patients would frequently make insurance co-payments using their own funds directly to the Cognitive Center. These payments were often made either through the U.S. mail or through credit and debit card transactions processed using interstate wire communications.

22. The Defendants' scheme and artifice to defraud, and to obtain money and property, included using the following false and fraudulent pretenses, representations, and promises:

    a. *Misrepresentation of Cognitive Center*. Having represented to the public and patients that the Cognitive Center was a place to receive medical care, Defendants never further informed the public and patients that no one actually working at the Cognitive Center was qualified or licensed to provide medical care of any kind.

7

Defendants represented S.A. JENKINS as a "Ph.D." and a "doctor" without identifying what she was a doctor of, and that her degree did not qualify her to provide medical treatment. For example, S.A. JENKINS was listed as a doctor on the Toledo Clinic's physicians' webpage. And her Toledo Clinic business cards identified her as a "PhD" without naming what degree she held and informing patients that her degree did not qualify her to provide medical care. As part of the scheme, Defendants often billed Cognitive Center patients for insurance co-pays. Patients frequently paid those charges with either a check deposited in the U.S. Mail, or with a credit or debit card that was processed using interstate wire communications.

b. *False Billing—Fraudulent Use of NPI Number*. Providers billing for health care services had an obligation to the Health Care Benefit Programs to provide accurate information about who provided the services and whether they were provided by a qualified individual. By submitting bills for neurocognitive testing and other services under DR. O.H. JENKINS's NPI number, Defendants falsely represented to the Health Care Benefit Programs that the billed services were performed by DR. O.H. JENKINS when in fact they were performed by S.A. JENKINS.

c. *False Billing—Fraudulent Use of CPT Codes*. The Defendants billed S.A. JENKINS's work at the Cognitive Center using CPT codes 96116 and 96118. These codes were to be billed "per hour of the psychologist's or physician's time, both face-to-face time administering tests to the patient and time interpreting these test results and preparing the report." S.A. JENKINS was neither a

      psychologist nor a physician, and thus she could not perform the services billed under these codes. She likewise was unqualified to order PET scans and unable to bill for them under CPT code 78608.

d. *False Billing—Services Billed But Not Provided*. Defendants also submitted bills for services that were never provided. For example, Defendants billed hours for tests and exams in excess of time S.A. JENKINS spent with a patient. Defendants billed for phone calls from S.A. JENKINS to patients as though she were a physician or psychologist spending face-to-face time with the patient.

e. *Fraudulent Billing—Medical Necessity*. Defendants routinely billed the Health Care Benefit Programs for follow-up behavioral status exams and other services once S.A. JENKINS diagnosed a patient with Alzheimer's Disease or another cognitive disorder. During these visits, S.A. JENKINS would counsel patients on memory exercises, the use of coconut oil to treat cognitive disorders, and other treatments, all of which were medically unnecessary. By billing for these services, however, Defendants fraudulently represented to the Health Care Benefit Programs that the services were medically necessary.

All in violation of Title 18, United States Code, Section 1349.

COUNT 2
(Mail Fraud, 18 U.S.C. § 1341)

The Grand Jury further charges:

23. The factual allegations of paragraphs 1 through 9 and paragraphs 12 through 22, of this indictment are incorporated by reference herein.

24. From on or about November 1, 2013 and continuing until on or about March 1, 2016, in the Northern District of Ohio, Western Division, Defendants SHERRY-ANN JENKINS

and OLIVER H. JENKINS, knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property of patients by means of false and fraudulent pretenses, representations, and promises, and in doing so, deposited and caused to be deposited the following mail matter, among others, in any post office or authorized depository for mail matter to be sent and delivered by the Postal Service and any private or commercial interstate carrier:

| Approx. Mailing Date | Mailed By | Received By | Description of Mailing |
|---|---|---|---|
| August 13, 2015 | Patient 1 | The Toledo Clinic | Check Number 4300 for payment of various blood tests performed on or about August 4, 2015 for use by the Cognitive Center |
| January 7, 2016 | Patient 2 | The Toledo Clinic | Check Number 1071 for payment on Toledo Clinic account 200210094 for Cognitive Center services |
| February 3, 2016 | Patient 1 | The Toledo Clinic | Check Number 4450 for payment of Toledo Clinic claim number 427804 for Cognitive Center services |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT 3
(Wire Fraud 18 U.S.C. § 1343)

The Grand Jury further charges:

25. The factual allegations of paragraphs 1 through 9 and paragraphs 12 through 22 of this indictment are incorporated by reference herein.

26. From on or about November 1, 2013 and continuing until on or about March 1, 2016, in the Northern District of Ohio, Western Division, Defendants SHERRY-ANN JENKINS and OLIVER H. JENKINS knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property from patients by means of false and fraudulent pretenses, representations, and promises.

27. For the purpose of executing and attempting to execute the scheme and artifice, Defendants SHERRY-ANN JENKINS and OLIVER H. JENKINS, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following

10

writings, signs, signals, and pictures, among others:

| Approx. Date | Description of Wire Communication |
|---|---|
| May 5, 2015 | Electronic communication from The Toledo Clinic to Capital One authorizing a charge to Patient 3's credit card for payment of medical services related to The Cognitive Center in the amount of $40.00 |
| May 18, 2015 | Electronic communication from The Toledo Clinic to Capital One authorizing a charge to Patient 3's credit card for payment of medical services related to The Cognitive Center in the amount of $1,319.00 |
| September 14, 2015 | Electronic communication from The Toledo Clinic to Optum Bank authorizing a charge to Patient 4's HSA debit card for payment of medical services related to The Cognitive Center in the amount of $304.83 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 4
(Health Care Fraud, 18 U.S.C. § 1347)

28. The factual allegations of paragraphs 1 through 9 and paragraphs 12 through 22 of this indictment are incorporated by reference herein

29. From on or about November 1, 2013 and continuing until on or about March 1, 2016, in the Northern District of Ohio, Western Division, in the Northern District of Ohio, Western Division, Defendants SHERRY-ANN JENKINS and OLIVER H. JENKINS, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud the Health Care Benefit Programs, and to obtain by means of false and fraudulent pretenses, representations and promises, money owned by, and under the custody and control of the Health Care Benefit Programs, in connection with the delivery of, and payment for, health care benefits, items, and services.

30. For the purpose of executing and attempting to execute the scheme and artifice, Defendants SHERRY-ANN JENKINS and OLIVER H. JENKINS, submitted, among others, the following claims for reimbursement:

11

| Date of Service | Claim | Payment | CPT Code | Health Care Benefit Program/Beneficiary |
|---|---|---|---|---|
| December 19, 2014 | $1,573.00 submitted Jan. 6, 2015 | $542.76 paid January 14, 2015 | 78608 | Paramount/Patient 5 |
| March 13, 2015 | $1,448.00 submitted March 17, 2015 | $1,039.92 paid April 3, 2015 | 96118 | Paramount/Patient 6 |
| April 14, 2015 | $543.00 submitted April 16, 2015 | $364.97 paid May 1, 2015 | 96118 | Paramount/Patient 7 |
| April 14, 2015 | $543.00 submitted April 20, 2015 | $364.97 paid May 8, 2015 | 96118 | Paramount/Patient 8 |
| April 14, 2015 | $543.00 submitted April 20, 2015 | $364.97 paid May 8, 2015 | 96118 | Paramount/Patient 6 |
| May 12, 2015 | $456.00 submitted December 7, 2015 | $216.81 paid December 17, 2015 | 96118 | Anthem Blue Cross Blue Shield/Patient 3 |
| June 16, 2015 | $724.00 submitted October 15, 2015 | $299.64 paid November 2, 2015 | 96118 | Railroad Retirement Board/Patient 9 |
| August 24, 2015 | $905.00 submitted October 29, 2015 | $437.90 paid November 10, 2015 | 96118 | Blue Cross Blue Shield Michigan/Patient 10 |
| October 14, 2015 | $456.00 submitted October 15, 2015 | $216.81 paid October 20, 2015 | 96116 | Medicare/Patient 11 |
| October 14, 2015 | $456.00 submitted October 16, 2015 | $216.81 paid October 21, 2015 | 96116 | Medicare/Patient 12 |
| October 20, 2015 | $152.00 submitted October 20, 2015 | $81.21 paid October 29, 2015 | 96116 | Medical Mutual/Patient 13 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

FORFEITURE SPECIFICATION

The Grand Jury further charges:

31. The allegations contained in Counts 1 through 4, inclusive, of this indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461 and 18 U.S.C. § 982(a)(2).

32. As a result of the foregoing offenses, the Defendants, SHERRY-ANN JENKINS and OLIVER H. JENKINS, shall forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of such offense(s), 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461; and, all property constituting, or derived from,

proceeds Defendants obtained directly or indirectly as the result of such offense(s), 18 U.S.C. § 982(a)(2)

33. Defendants, SHERRY-ANN JENKINS and OLIVER H. JENKINS, shall forfeit property, including, but not limited to, a sum of money equal to the value of all property involved in Counts 1–4 in the form of a money judgment pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), 18 U.S.C. § 982(b)(1), and 31 U.S.C. § 5317(c)(1)(B), and Federal Rule of Criminal Procedure 32.2.

34. In the event that any property subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461, and/or 18 U.S.C. § 982(a)(2), and/or 18 U.S.C. § 982(a)(1), and/or 31 U.S.C. § 5317(c)(1), as a result of any act or omission of Defendants:

   a.) cannot be located upon exercise of due diligence;

   b.) has been transferred or sold to, or deposited with a third party;

   c.) has been placed beyond the jurisdiction of this Court;

   d.) has been substantially diminished in value; or

   e.) has been commingled with other property which cannot be divided without difficulty.

It is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), 18 U.S.C. § 982(b)(1), and 31 U.S.C. § 5317(c)(1)(B), to seek forfeiture of any other property of Defendant, up to the value of the forfeitable property described above.

A TRUE BILL.

Original document—Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.